TERRITORY *ex rel.* WADE *v.* ASHENFELTER.

(*Supreme Court of New Mexico.* January 21, 1887.)

1. QUO WARRANTO—JURISDICTION OF NEW MEXICO DISTRICT COURTS.

In New Mexico, a proceeding by information in the nature of a writ of *quo warranto* to oust a usurper from office is within the jurisdiction of, and is properly commenced in, the district court.

2. SAME—ORIGINAL WRIT—PROCEEDING BY INFORMATION.

The original writ of *quo warranto* is obsolete, and the proper remedy for the purpose of ousting a usurper from office is now by information in the nature of *quo warranto.*[1]

3. SAME—RETURN OF PROCESS—COMP. LAWS N. M. § 1903.

Comp. Laws N. M. § 1903, requiring all original process in any suit to be returned on the first day of the term next after its issuance, applies only to ordinary actions commenced by petition, and not to the extraordinary remedies of *habeas corpus, quo warranto, mandamus,* etc., and process issued upon an information in the nature of *quo warranto* may be made returnable at the same term when the information is filed.

[1] See note at end of case.

**4.** DISTRICT AND PROSECUTING ATTORNEYS—NEW MEXICO ACT FEBRUARY 28, 1862, § 19—
CONSTRUCTION OF.
    Section 19 of the New Mexico act of February 28, 1862, entitled "An act  *  *  *
to authorize the governor to appoint a district attorney for the Third district," pro-
vides "that the governor  *  *  *  shall appoint some person learned in law as *at-
torney general* for the Third judicial district." *Held* that, as a literal construction
of the section would render the act nugatory, recourse must be had to the title and
context, and that it was apparent that the section intended to provide for the ap-
pointment of a *district attorney*, who should hold for a fixed term of two years.

**5.** STATES AND STATE OFFICERS—GOVERNOR—POWER OF DISMISSAL.
    The governor of the territory of New Mexico has no power, either inherent in
the office of governor, or under the organic act of the territory, to remove a judi-
cial officer holding office for a fixed term, before the expiration of such term.

Appeal from district court, Sierra county.

 · *Quo warranto* to try title to the office of district attorney for the Third ju-
dicial district. Judgment against the defendant, who appeals.

 ,*G. G. Posey, Idus L. Felder*, and *W. T. Thornton*, for appellant.   *Wm.
Breeden*, Atty. Gen., for appellee.

LONG, C. J.  This is a proceeding brought by the territory of New Mex-
ico, on the relation of Edward C. Wade, against Singleton M. Ashenfelter,
who is appellant. On the tenth day of November, A. D. 1885, the relator,
Edward C. Wade, filed in the office of the clerk of the district court of the
Third judicial district, sitting in the county of Sierra, an affidavit of which
the following is a copy:

  *"Territory of New Mexico, County of Sierra.*  Edward C. Wade, of law-
ful age, being duly sworn, upon his oath states that heretofore, to-wit, in the
month of March, A. D. 1884, he was, by the governor of the territory of New
Mexico, in due form of law, nominated for the office of district attorney for
the Third judicial district of said territory; that such nomination was trans-
mitted and submitted to the legislative council of said territory, and by said
council confirmed, advised, and consented to, and that thereafter, on the
eleventh day of March, A. D. 1884, the said governor, by and with the advice
and consent of said legislative council, then in session at the capitol of said
territory, said advice and consent being given upon said nomination as
aforesaid, appointed and commissioned him as such district attorney of said
Third judicial district in due form of law; that he thereupon and thereafter
took the oath of office, and entered upon his duties as such district attorney,
and was legally possessed of and performed the duties of said office, and
exercised the powers and received the emoluments thereof, from the time of
his said appointment to and induction into said office, as aforesaid, until the
ninth day of November, A. D. 1885; that from and after his induction into
said office, as aforesaid, he never resigned, abandoned, or forfeited the same,
nor was he ever removed or displaced from said office by the judgment of any
court, nor has the said office, since his appointment thereto, been abolished,
or its tenure in anywise changed or altered, nor has his term expired; that,
by virtue of his said appointment, he was (as he is advised and believes)
legally entitled to hold said office, perform the duties and receive the emolu-
ments thereof, for the full term of two years, and thereafter until his suc-
cessor to said office should be lawfully appointed and qualified. He further
states that on the ninth day of November, A. D. 1885, one Singleton M. Ash-
enfelter, illegally claiming said office under color of an unauthorized, illegal,
and void appointment, (as affiant is advised and believes,) made long after the
date of affiant's appointment, by the governor of the territory of New Mexico,
without the advice and consent of the legislative council of said territory, and
at a time when said council was not in session, usurped, intruded into, and un-
lawfully (as affiant is advised and believes) held said office of district attorney
for the said Third judicial district of the territory of New Mexico, and still
does unlawfully (as affiant is advised and believes) hold said office, perform

and execute the powers and duties thereof, and claim the emoluments of the same; and that since the said ninth day of November, A. D. 1885, the said Singleton M. Ashenfelter unlawfully (as affiant is advised and believes) excluded, and still excludes, this affiant from said office, and has refused, and still refuses, to allow this affiant to hold and execute the said office or to receive the emoluments thereof. Affiant further says that he is desirous that the title of this affiant and of said Ashenfelter to said office, and the right to exercise its functions, and receive its emoluments, should be judicially inquired into and determined, and that to that end a rule may be made upon the facts herein stated, upon motion of the attorney general of the territory of New Mexico, for said territory, upon the said Singleton M. Ashenfelter to show cause, if any he hath, why leave should not be given to file an information in the nature of a *quo warranto* in behalf of said territory, upon the relation of this affiant, the said Edward C. Wade, against the said Singleton M. Ashenfelter for usurping, intruding into, and unlawfully holding and exercising said office as aforesaid.

[Signed] "EDWARD C. WADE.

"Subscribed and sworn to before me this tenth day of November, A. D. 1885.

"GEORGE R. BOWMAN, Clerk."

And thereupon William Breeden, attorney general, appeared in open court, and moved for a rule upon Singleton M. Ashenfelter, predicated on said affidavit, to show cause, if any he had, why the said attorney general should not have leave to file an information in the nature of a *quo warranto* in said court on behalf of the territory of New Mexico, on relation of said Wade, and against said Ashenfelter, for having illegally usurped and intruded into the office of district attorney for the Third judicial district of said territory. On the same day the court granted said rule, requiring the respondent to so appear in said court on the 12th. On that day, Ashenfelter being in court in person, and it having been shown that the rule to appear had been served upon him as ordered, and no cause being shown, on motion of the attorney general leave was given to file such information, and the same was then and there in open court on such leave filed. On the thirteenth day of November the attorney general appeared in open court, and moved for an order directing process to issue upon said information, which process was on the seventeenth day of said month ordered by the court, and which thereupon issued in the following words:

"*The Territory of New Mexico to Singleton M. Ashenfelter, Greeting:* Whereas, Wm. Breeden, attorney general for the territory of New Mexico, on the relation of Edward C. Wade, hath filed in the district court for the Third judicial district of the territory of New Mexico, sitting within and for the county of Sierra, by leave of the court, an information in the nature of a *quo warranto* alleging and charging that you, the said Singleton M. Ashenfelter, have unlawfully usurped, intruded into, and held the office of district attorney for the Third judicial district of the territory of New Mexico, and unlawfully exercised the powers and functions thereof, and that you, the said Singleton M. Ashenfelter, still unlawfully hold said office, and exercise the powers and functions thereof, without any authority of law, and to the exclusion of the said Edward C. Wade, who, it is alleged, is the legally appointed district attorney for said district, and lawfully entitled to the possession of said office, and to hold and enjoy and to exercise the powers and functions thereof, therefore you, the said Singleton M. Ashenfelter, are hereby commanded that, laying all other matters and things aside, you do appear, at 10 o'clock A. M., on Wednesday, November 18, 1885, before the said district court, now sitting in said county of Sierra, at the court-house of said county, then and there to answer unto said information concerning the matters therein

alleged and charged against you, and observe what the said court shall direct in this behalf. And this you do under penalty of the law, and on pain of such judgment and other process as said court shall award.

"Witness the Hon. WM. F. HENDERSON, associate justice of the supreme court of the territory of New Mexico, and judge of the Third judicial district court thereof, and the seal of said court, this seventeenth day of November, A. D. 1885.

[Seal]                                        "GEORGE R. BOWMAN, Clerk."

On which said writ the sheriff of Sierra county, New Mexico, on the seventeenth day of November, 1885, made the following return, and filed said writ, with said return, with the clerk:

"I certify that I served the within writ upon the within-named Singleton M. Ashenfelter at the county of Sierra, this, the seventeenth, day of November, A. D. 1885, at 10 o'clock A. M.

"THOMAS MURPHY, Sheriff of Sierra County."

This process was served on the day it issued, and the next day, the 18th, the following stipulation was filed in court:

"THE TERRITORY OF NEW MEXICO, COUNTY OF SIERRA, ss.—IN THE DISTRICT COURT FOR THE THIRD JUDICIAL DISTRICT. November Term, 1885.

"*The Territory of New Mexico, on the Relation of Edward C. Wade,* vs. *Singleton M. Ashenfelter.*

"In order to expedite and obtain a speedy determination of this cause, and to save the defendant all of the rights that he may have touching the jurisdiction of the court over his person herein, and that none of them may be waived, it is hereby agreed that the plea to jurisdiction and the answer may be filed and considered at the same time, without the general appearance, which may be entered for the purpose of such answer, being considered as giving jurisdiction over the person of the defendant, but that the question as to whether the court acquired jurisdiction over the person of the defendant by reason of a process of summons issued by the court during the present term of this court, and made returnable to the present term of this court, may be considered the same as if no general answer had been made, but only a special appearance for that purpose entered.

"*November* 18, 1885.                    WM. BREEDEN,
                                             "Attorney General.
                                    "G. G. POSEY,
                                    "IDUS L. FELDER,
                                    "W. T. THORNTON,
                              "Attorneys for Defendant."

The respondent appeared specially in the district court, and moved the court to quash the process, and dismiss the information, and stated his reasons as follows:

*First.* Because the court has no jurisdiction over the subject-matter, and no power to proceed by information, and can only proceed to try the right of office by the original writ of *quo warranto,* and not by an information in the nature of a *quo warranto.*

*Second.* The process issued in this cause is an original writ issuing out of this court, and could only be made returnable at the next succeeding term after the same was issued; whereas, the writ issued in this case was made returnable the same term at which it was issued.

"*Third.* Because the court, as appears upon the face of the information and the writ, has no jurisdiction either of the subject-matter in controversy, or of the person of the defendant.

[Signed]                                    "SINGLETON M. ASHENFELTER."

The motion was overruled, and the respondent excepted. Answer was then filed, and the case submitted on the information and answer. At a later day of the same term the court adjudged, and so entered of record, that Ashenfelter is not entitled to the possession of the office of district attorney for the Third judicial district, and that he unlawfully holds the same, but that Edward C. Wade is such district attorney, and lawfully entitled to the possession of such office; and it is further adjudged that Ashenfelter surrender said office to the said Wade. From this judgment Ashenfelter appeals.

The questions presented by the record for determination here, therefore, are: *First.* Did the court below err in overruling the motion to quash, and in taking jurisdiction over the person and subject-matter, and in proceeding to hear and determine the case? *Second.* Did the court err in its final judgment?

Upon the first alleged error, appellant contends: *First,* that, if any tribunal in this territory has jurisdiction, it is the supreme and not the district court; *second,* if any remedy exists to redress the wrong complained of, it is not on information, but by the original writ of *quo warranto; third,* that in any event the respondent should not have been required to appear at the term when the information was filed, but at a subsequent one.

As to the first question, sections 2006 and 2014, Comp. Laws, are recited. The first of these sections gives power to the supreme court to issue writs of prohibition; the other one confers authority on any judge of the supreme court to issue writs of *habeas corpus.* It does not, therefore, follow, that exclusive jurisdiction is in the supreme court over such a proceeding as this one, especially in the light of section 666, Comp. Laws, as follows: "The district court shall have original jurisdiction *in all cases,* civil and criminal, in which jurisdiction is not specially delegated to some other court." No statute has been cited which does "specially delegate" to the supreme court jurisdiction in this class of cases; and, in the absence of it, the foregoing section,.by its express terms, settles the question of jurisdiction to be in the district court, but does not determine the character of the proceeding. One provision of the organic act provides: "The district courts shall possess chancery as well as common-law jurisdiction." Section 1823 of the Compiled Laws, which section came in force in 1876, reads: "In all courts in this territory the common law, as recognized in the United States of America, shall be the rule of practice and decision."

This court, in the case of *Browning* v. *Estate of Browning,* 9 Pac. Rep. 677,[1](decided at last January term,) considered these provisions, and also made a review of the cases decided in the territory referring thereto. It was there held, (page 684:)[2] "The legislature intended by the language used in that section to adopt the common law, or *lex non scripta,* and such British statutes of a general nature, not local to that kingdom, nor in conflict with the constitution or laws of the United States, nor of this territory, which are applicable to our condition and circumstances, and which were in force at the time of our separation from the mother country."

If section 1823, *supra,* and the section of the organic act above referred to, are applicable to this proceeding, our inquiry must be whether the common law, at the time of that separation, was such as to warrant the action of the court below.

In *Leitensdorfer* v. *Webb,* 1 N. M. 34, it is said: "By the tenth section of the organic law it is provided that the supreme and district courts, respectively, shall possess chancery as well as *common-law jurisdiction.* Jurisdic-

---

[1] Same case, 3 N. M. 371.                [2] 3 N. M. 378.

tion is properly the power to hear and determine causes. The common law, then, at least so far as to control and regulate the proceedings of the district court *in the hearing and determining of causes*, has been extended over this territory by act of congress, and that court, when it proceeds to hear and determine, must observe the course of proceeding prescribed by the common law." It may be this point was not exactly before the court in that case for determination, but the opinion is an elaborate and very able one, and the language quoted above was no doubt carefully considered, and evidently the deliberate judgment of the court on the point stated.

In *Arellano* v. *Chacon*, 1 N. M. 269, a case twice argued in the supreme court, and therefore presumably very carefully considered, the same section of the organic act herein quoted was before the court, and it was held: "The district courts of this territory may try issues of fact by juries, set aside verdicts for established legal causes, and grant new trials. To exert these high powers, the law has expressly conferred the authority. It is a parcel of that common-law jurisdiction of which they are made the depositories by the organic act."

When the observations made in the foregoing opinions are supplemented by the considerations stated in *Browning* v. *Estate of Browning, supra*, and the provisions of section 1823 of the Compiled Laws, it seems reasonably clear that the rule at common law as the same existed at the time of our separation from England, except so far as modified by statute, must determine the practice in the court below. If the territorial statute provides a rule of practice, it must govern; but, in its absence, the course of proceeding at common law must be ascertained and followed. Recourse must therefore be had to the common law to ascertain whether the remedy is by the original writ of *quo warranto* as claimed by appellant.

"*Quo warranto*, a writ which lies against any person or corporation that usurps any franchise or liberty against the king without good title; and is brought against the usurpers to show by what right and title *they* hold or *claim* such franchise or liberty. It is in the nature of a writ of right for the king against him who holds, claims, or usurps an office, * * * to inquire by what authority he supports his claim, in order to determine the right. * * * The judgment on a writ of *quo warranto* (being in the nature of a writ of right,) is *final and conclusive even against the crown*. This, together with the length of its process, probably occasioned that disuse into which it is now fallen, and introduced a more modern method of prosecution, by information filed in the court of king's bench by the attorney general, in the nature of a *writ of quo warranto;* wherein the process *is speedier*, and the judgment not quite so decisive. * * * This is properly a criminal method of prosecution, as well to punish the usurper by a fine for the usurpation of the franchise, as to oust him, or to seize it from the crown, but hath long been applied to the mere purpose of trying the civil right, seizing the franchises, or ousting the wrongful possessor; the fine being nominal. * * * This proceeding is now applied by virtue of St. 9 Anne, *c.* 20, which permits an information in the nature of a *quo warranto* to be brought, with the leave of the court, at the relation of any person desiring to prosecute the same, against any person intruding into, or unlawfully holding, any franchise or office in any city, borough, or town corporate,—provides for its speedy determination." 5 Jac. Law Dict. page 373, and authorities there cited; 5 Toml. Law Dict. 280; 3 Wend. Bl. 262.

"The writ of *quo warranto* has long been superseded in practice by the proceeding by information in the nature of a *quo warranto*, which is the usual proceeding also in American practice." Bouv. 373.

"There is one species of information still further regulated by St. 9 Anne, *c.* 20, viz., those in the nature of a writ of *quo warranto*, which was shown in the preceding volume to be a remedy given to the crown against such as

had usurped or intruded into any office or franchise. The modern information tends to the same purpose as the ancient writ." 4 Wend. Bl. 312.

An information in the nature of a *quo warranto*, though a proper proceeding to try a right in respect to which, in strictness in words, it may not come, yet, being a remedial law, it shall receive as large a construction as the words will bear. 1 Salk. 376.

Upon a motion for leave to file an information in the nature of a *quo warranto*, in *State* v. *Burnett*, 2 Ala. 142, it is said: "The convenience of this mode of proceeding has rendered the old writs for ascertaining a right to an office or franchise entirely obsolete, and it may be questioned whether they would now be effectual."

In *Donnelly* v. *People*, 11 Ill. 553, it is held: "That proceeding [by information] is a substitute for the ancient writ of *quo warranto*."

"The precise period when this ancient writ fell into disuse in England, and its place was usurped by the more modern remedy of an information in the nature of a *quo warranto*, cannot be definitely ascertained. It is certain, however, that the information, itself a common-law remedy, was of very early date, and it is probable that it began to supersede the more ancient remedy upon the abolition of the king's justices in eyre, and the substitution of the justices of assize." High, Extr. Rem. 467.

It is established by the authorities cited, and their number could be increased, that the ancient original writ was long ago superseded, and cannot be the proper remedy in this case. This view of that question disposes of the second point pressed upon the attention of this court.

The next matter, in its proper order for consideration, is whether the court erred in requiring process to issue returnable at the same term when the information was filed. Appellant, to support his contention that process should have issued returnable at the next term, *instead of at the same term*, cites section 1903, Comp. Laws, as follows: "All original process in any suits shall be returned on the first day of the term next after its issuance. By this statute the first day of the term next after it issues is the return-day of process authorized by the provisions of the section. The important inquiry is whether the section is applicable to extraordinary proceedings like the one here. Did the legislative assembly intend the section quoted to apply to remedies of an extraordinary kind, such as *mandamus*, prohibition, *quo warranto*, and the like, or was it the intention to apply it only to ordinary remedies as distinguished from extraordinary ones?

In Rap. & L. Law Dict. 1017, process is thus defined: "A form of proceeding taken in a court of justice for the purpose of giving compulsory effect to its jurisdiction. The process of various courts of record consists of writs, summons, warrants, etc., and hence the terms 'process' and 'writs' are often used synonymously."

In this manner the term "original process" is used in that section, and it is necessary to consider whether the process proper to issue when leave is granted to file an information in the nature of a writ of *quo warranto* was intended by section 1903.

Sir William Blackstone, (volume 3, p. 131,) in speaking of *habeas corpus*, uses this language: "In the king's bench and common pleas it is necessary to apply for it [the writ of *habeas corpus*] by motion to the court, as in case of all other prerogative writs,—*certiorari*, prohibition, *mandamus*, etc.,— which do not issue as of mere course, without showing probable cause why the extraordinary power of the crown is called in to the party's assistance."

"Prerogative writs" are "remedies of an *extraordinary kind* granted by the courts in *certiorari* cases, but never as a matter of right; they being a direct intervention of the government with the liberty or property of the subject. The principal writs of this nature are (1) the writ of *procedendo*; (2)

the writ of *mandamus;* (3) the writ of prohibition; (4) the writ of *quo war-ranto;* (5) the writ of *habeas corpus;* (6) the writ of *certiorari.*" 2 Rap. & L. Law Dict. 697. "The prerogative writ of *quo warranto* has, however, fallen into disuse." Id. 1057.

These various writs are generally referred to as high prerogative writs, issuing, as they do, in a class of special remedies of extraordinary character. "Originally the writ of *mandamus* was purely a prerogative writ. It was so called because it proceeded from the king himself, in his court of king's bench, superintending the police and preserving the peace of the realm." High, Extr. Rem. § 3. So it was with the original writ in *quo warranto*, prohibition, and in other extraordinary proceedings. As distinguished from what may, for the purpose of distinction, be designated as ordinary proceedings,—those in usual use for the redress of grievances continually arising,—they were re-garded as extraordinary, and were instituted, as Blackstone states, *supra*, "by motion to the court, as in case of all prerogative writs," and were not granted as a matter of course, but on leave only.

Was it the intention of the legislative assembly to apply section 1903, *supra*, to these extraordinary remedies, instituted, before the passage of that section, only on leave of the court, or to provide a uniform rule as to ordinary actions? This section was a part of the act of July 12, 1851. See page 190, Comp. Laws 1865. Resort to the context is proper in determining construction, and, on examination of the act, the purpose of this section will become more apparent. That act undertook to provide a code of practice in ordinary cases.

Section 20 of that act reads: "All civil suits shall be commenced and con-ducted by petition and answer, replication and rejoinder, rebutter and sur-rebutter, and in this order until the issue is formed." Section 211: "When any person who may think he has a cause of action shall wish to bring suit against his adversary, he shall file in the office of the clerk a petition." The section then names what shall be set out in the petition. Section 37 is identi-cal with section 1903 of the Compiled Laws of 1884, and reads: "All original process in any suit shall be returned on the first day of the term next after its issuance."

It was in this connection that the section under consideration was made a part of the act of 1851. The system of practice thus instituted had its foun-dation in a petition as the cause of action. This petition was intended to take the place of the common-law declaration, and the bill of complaint in equity, and to combine the two systems of pleading and practice into one in the nature of a Code, as is manifest from section 6: "The names and distinc-tions between different actions as known to the common law of England and the United States shall not be deemed material by the courts of this territory, and all matters of complaint or defense of a like nature may be joined, re-spectively, in the petition and answer."

It was in suits of this kind, brought by the petition provided for, to which the section now numbered 1903 in the Compiled Laws of 1884 was to apply, and the return-day of the process for which was fixed at the next term. It must be apparent this attempt to provide a new practice did not extend to the extraordinary remedies of *habeas corpus, quo warranto, mandamus*, and the like, which were all well recognized as a separate and distinct class of pro-ceedings, in which speed was the very essence of the remedy, but was only intended to apply to those ordinary suits in which the process issued as a mat-ter of course. It was actions founded on petition, and not those based on in-formation to which the section applied. The one class was originally insti-tuted only on leave of the court to obtain a "prerogative writ," and the practice as to them is thus defined:

"Prerogative writ. In practice a writ issued upon some extraordinary oc-casion, and for which it is necessary to apply by motion to the court." "A

writ not issuing as of course, without showing some probable cause why it should be granted. The writs of *habeas corpus, procedendo, mandamus,* prohibition, *quo warranto,* belong to this class." 2 Burrill, 822; 3 Bl. Comm. 132; 3 Steph. Comm. 681.

To hold that this statute determines the character and return-day of the process in these special proceedings would be to utterly ignore the well-known distinctions at common law between cases originating under the high prerogative writs, by leave, on motion, usually designated extraordinary remedies, and that other equally well-defined large class of cases where process is not a question of leave, but is issued as a matter of right, and introduce confusion and delay in place of certainty and speed.

Can it be reasonably contended the assembly meant, by the act of 1851, that one believing himself aggrieved could file with the clerk his petition, not verified, and thereupon, without leave, as a matter of course, a writ of *habeas corpus, mandamus,* or *quo warranto* should issue returnable at the next term? The statement of the inquiry carries its own answer.

The following case is in point: "*Quo warranto* is the legal writ to try the right to hold office and for ousting a usurper. This court sits but once a year. The writ does not issue except upon motion, and after rule and cause shown; and if, when issued, it must go to the common rules for pleading, * * * the remedy will prove wholly ineffectual; for the office usurped would expire before the complaint would be got ready for trial, and the judgment of ouster, if rendered, would operate on a person no longer in the possession of the office. We must so exercise jurisdiction as to give effect to the administration of the law, and not take a course certain to render it nugatory. The defendant will be ruled to plead to-morrow morning." *State* v. *Buchanan,* Wright, (Ohio,) 239.

In Vermont the statute provided: "Power is given to the supreme court to issue and determine all writs of error, *certiorari, mandamus,* prohibition, and *quo warranto;*" but the mode of procedure was not prescribed. The supreme court, in *State* v. *Smith,* 48 Vt. 281, adopted the practice in England. Judge REDFIELD, a very able jurist and law writer, in that case makes the ruling in the following terms: "It is not denied that at the time our statute was enacted, and down to the present time, the practice was settled and uniform in the courts of England that, after leave was granted and the information filed, the respondents had time and opportunity to plead to the information. *The nature of the application is summary, and* requires speed; *and the court will see to it that there is no delay.* * * * The statute gives merely jurisdiction to this court of these prerogative writs. * * * We think, when an information is allowed to be filed, it is the duty of the court to fix some time, ordinarily *during the same term,* for the respondent to appear and plead."

*Lindsey* v. *Attorney General,* 33 Miss. 523, is a very instructive case. The practice adopted by the trial court in the case now here evidently followed that one. The practice in the two cases is identical. If the rule followed in that case is correct, there is no error in the mode of proceeding adopted in the Third district in this one. It is observed in the Mississippi case: "The very nature of the right asserted requires a speedy remedy. It is not only the right of the party having the legal title to the office to be placed at once in possession and enjoyment of it, but it is also the policy of the law that he alone who has been intrusted with the public confidence, in the mode pointed out by law, should perform the duties of the office. The remedy, to be valuable, should be speedy. It was so under the practice as regulated by the rules of the common law, * * * and we find nothing in the policy of the law, or the theory of our government, requiring us to make the remedy less efficient than it is under the English practice."

The same reason applies with even greater weight in this territory.

The statute of Anne, to which reference is made, became a law in A. D. 1710; and, so far as applicable to this cause, is as follows, (see High, 647; Statute of Anne, 9 Anne, c. 20:)

"An act for rendering the proceedings upon writs of *mandamus* and informations in the nature of a *quo warranto* more speedy and effectual, and for the more easy trying and determining the rights of offices and franchises in corporations and boroughs.

"(1) Whereas, divers persons have of late illegally intruded themselves into, and have taken upon themselves to execute, the offices of mayors, bailiffs, portreeves, and other offices, within cities, towns corporate, boroughs, and places within that part of Great Britain called England and Wales; and, where such offices were annual offices, it hath been found very difficult, if not impracticable, by the laws now in being, to bring to a trial and determination the right of such persons to the said offices within the compass of the year; and, where such offices were not annual offices, it hath been found difficult to try and determine the right of such persons to such offices before they have done divers acts in their said offices prejudicial to the peace, order, and good government within such cities, towns corporate, boroughs, and places wherein they have respectively acted; and whereas, divers persons who had a right to such offices, or to be burgesses or freemen of such cities, towns corporate, boroughs, or places, have either been illegally turned out of the same, or have been refused to be admitted thereto, having in many of the said cases no other remedy to procure themselves to be respectively admitted or restored to their said offices or franchises of being burgesses or freemen than by writs of *mandamus,* the proceedings on which are very dilatory and expensive, whereby great mischiefs have already ensued, and more are likely to ensue, if not timely prevented,—for remedy whereof be it enacted by the queen's most excellent majesty, by and with the advice and consent of the lords spiritual and temporal, and commons, in this present parliament assembled, and by the authority of the same, that from and after the first day of Trinity term, in the year of our Lord one thousand seven hundred and eleven, where any writ of *mandamus* shall issue out of the court of queen's bench, the courts of sessions of counties palatine, or out of any of the courts of grand sessions in Wales, in any of the cases aforesaid, such person or persons who by the laws of this realm are required to make a return to such writ of *mandamus* shall make his or their return to the first writ of *mandamus.*"

"(4) And be it further enacted by the authority aforesaid, that from and after the said first day of Trinity term, in case any person or persons shall usurp, intrude into, or unlawfully hold and execute any of the said offices or franchises, it shall and may be lawful to and for the proper officer in each of the said respective courts, with the leave of the said court, respectively, to exhibit one or more information or informations in the nature of a *quo warranto,* at the relation of any person or persons desiring to sue or prosecute the same, and who shall be mentioned in such information or informations to be the relator or relators, against such person or persons so usurping, intruding into, or unlawfully holding and executing any of the said offices or franchises, and to proceed therein in such manner as is usual in cases of information in the nature of a *quo warranto;* and, if it shall appear to the said respective courts that the several rights of divers persons to the said offices or franchises may properly be determined on one information, it shall and may be lawful for the said respective courts to give leave to exhibit one such information against several persons, in order to try their respective rights to such offices or franchises; *and such person or persons against whom such information or informations in the nature of a quo warranto shall be sued or prosecuted shall appear and plead as of the same term or sessions in which the said information or informations shall be filed,* unless the court where

such information shall be filed, shall give further time to such person or persons against whom such information shall be exhibited, to plead; and such person or persons who shall sue or prosecute such information or informations in the nature of a *quo warranto* shall proceed thereupon with the most convenient speed that may be, any law or usage to the contrary thereof in anywise notwithstanding.

"(5) And be it further enacted and declared by the authority aforesaid, that from and after the said first day of Trinity term, in case any person or persons against whom any information or informations in the nature of a *quo warranto* shall, in any of the said cases, be exhibited in any of the said courts, shall be found or adjudged guilty of a usurpation or intrusion into, or unlawfully holding and executing any of the said offices or franchises, it shall and may be lawful to and for the said courts, respectively, as well to give judgment of ouster against such person or persons of and from any of the said offices or franchises as to fine such person or persons, respectively, for his or their usurping, intruding into, or unlawfully holding and executing any of the said offices or franchises; and also it shall and may be lawful to and for the said courts, respectively, to give judgment that the relator or relators in such information named shall recover his or their costs of such prosecution; and, if judgment shall be given for the defendant or defendants in such information, he or they for whom such judgment shall be given shall recover his or their costs therein expended against such relator or relators, such costs to be levied in manner aforesaid.

"(6) And be it further enacted and declared by the authority aforesaid, that it shall and may be lawful to and for the said courts, respectively, to allow to such person or persons, respectively, to whom any writ of *mandamus* shall be directed, or against whom any information in the nature of a *quo warranto* in any of the cases aforesaid shall be sued or prosecuted, or to the person or persons who shall sue or prosecute the same, such convenient time, respectively, to make a return, plead, reply, rejoin, or demur, as to the said courts, respectively, shall seem just and reasonable, anything herein contained to the contrary thereof in anywise notwithstanding."

It is apparent from the tenor of the act that it was intended to furnish speedy relief against the wrongs mentioned in it. While the act in terms was limited to the "rights of offices and franchises in corporations and boroughs," yet its terms were extended in practice to include other rights and offices so that it gradually became the means for determining the title to office.

Here was an act in full force, furnishing a most speedy and convenient mode for ousting one who wrongfully intruded himself into office. In this country, where most offices are elective, and where terms are not long, and questions of title often occurring, we are asked to hold that the legislative assembly of this territory intended to adopt a system less effective than the English one, and which would create delay, and enable the holder to occupy for the full term before the final judgment of the law could oust him. If the possessor must be summoned to appear at an ensuing term, and the delay occurs incident to ordinary proceedings, it is too plain for doubt that the remedy is wholly without efficacy. We are not willing to believe, under our institutions, that any such legislative intent was present when section 1903, *supra*, was passed; but, on the contrary, are inclined to adopt that construction most in harmony with our institutions, and best calculated to insure a speedy determination of title to office,—a question under our political system of vital importance. By holding that that section was intended to apply only to ordinary proceedings, where process issues as a matter of course, and not to those special proceedings where speed is the essence of the remedy, a distinction in the mode of proceeding which formerly prevailed, and which now almost everywhere obtains, is preserved, and a system of procedure recognized which will best subserve the ends of justice, and accord with what we believe to have been the legislative intent. The conclusion is that it was cor-

rect practice in the court below to cause process to be issued and served returnable during the term; and in doing so the court committed no error, and therefore properly overruled the motion to quash the process.

Having thus disposed of the question of practice interposed, the inquiry next arising for determination is as to the final judgment of the court on the merits. The following are the facts established by the record upon which the judgment of the court below was predicated: March 11, A. D. 1884, Edward C. Wade, the relator, was duly and legally appointed by the governor of the territory of New Mexico, by and with the advice and consent of the legislative council thereof, to the office of district attorney for the Third judicial district. Said Wade took the oath of office as such district attorney, as required by law, and entered upon the duties thereof, and was lawfully possessed of the same. He performed its duties, and received its emoluments, continuously, openly, and notoriously, until the ninth day of November, A. D. 1885. He never resigned said office, abandoned the same, nor was he removed therefrom. On said last-named day, over the objection, protest, and opposition of said Wade, the appellant, Singleton M. Ashenfelter, took possession thereof, claiming to be lawfully entitled thereto.

The appellant predicates his right to the office in question on the following facts: On the twenty-eighth day of October, A. D. 1885, Hon. Edmond G. Ross was governor of said territory, and as such made, executed, and delivered to said Ashenfelter a commission, whereby, so far as he legally could, he appointed the said Ashenfelter to the said office. The said appointee accepted said commission, and duly and in legal form took the oath of office, and on the said ninth day of November, as before stated, took possession and began to discharge the duties of the same. From the date of the said commission so held by Ashenfelter, to the time of bringing this proceeding, the legislative council had not at any time been in session, and never advised or consented to said appointment in any form whatsoever, or took any action repealing the same.

The question, under these facts, is, which party was entitled to hold the said office at the institution of this case? As bearing upon the point, it is important to inquire if, at the date of Ashenfelter's commission, there was any vacancy in the office to which he was appointed. If there was such vacancy, then it becomes necessary to determine whether the governor had the legal power alone, in the recess of the legislature, to fill it. If there was no such vacancy otherwise occurring, then the question arises, did the governor have the power to create a vacancy by the mere act of appointment and delivery of the commission to Ashenfelter, and by the same act both create and fill the vacancy?

There is no pretense that there was any effort to remove the relator, unless the appointment of Ashenfelter and his commission so operated. It is important to determine whether the office of district attorney for the Third district is one with a certain tenure. To settle that inquiry the legislation of the territory must be examined; for upon its construction must rest the determination of the question whether or not the office of district attorney for the Third district has a fixed tenure. There can be no intelligent comprehension of the question without a consideration of the several acts of the assembly relating to the subject, and therefore said enactments are here set out as follows:

*First.*

"An act to create the office of attorney general."

"Sec. 7. That the governor, by and with the consent of the legislative council, shall appoint an attorney general for said territory, who shall reside and keep his office at the seat of government, and he shall hold his office for two years, and until his successor shall be appointed and qualified.

"Sec. 8. When required, he shall give his opinion in writing to the gover-

nor, auditor, and treasurer, upon any question of law relating to their respective duties and offices.

"Sec. 9. The attorney general shall commence and prosecute all criminal and civil actions in the district courts of the several counties of this territory, in which the territory or any county may be concerned; and in like manner he shall defend all suits which may be brought against the territory, or any county of the same; he shall prosecute forfeited recognizances, and actions for the recovery of debts, fines, penalties, and forfeitures accruing to the territory, or to any county thereof.

"Sec. 10. If the attorney general shall be interested or shall have been concerned in any cause, or shall be absent at the trial of any cause, in which the territory or any county is concerned, the district judge may appoint some other person to prosecute or defend the cause, and the person thus appointed shall have the same power, and receive the same fees, as the attorney general would if he was present.

"Sec. 11. In addition to the fees of office, the attorney general shall receive a salary of fifteen hundred dollars per annum: provided, that in no case shall there be taxed any fees against the territory for prosecuting or defending.

"Sec. 15. This act shall take effect and be in force from and after its passage.

"Approved February 2, 1859."

*Second.*

"An act to amend the law relative to the attorney general, and to authorize the governor to appoint a district attorney for the Third district of this territory."

"Sec. 16. That the law authorizing the appointment of an attorney general for this territory be, and the same is, so amended as to require the attorney general to perform the duties therein designated in the supreme court, and district courts of the First and Second judicial districts only.

"Sec. 17. The salary of the attorney general shall be reduced to six hundred dollars, instead of fifteen hundred, as now provided by law.

"Sec. 18. That all the duties required of the attorney general by law now in force shall remain in full force as it concerns him.

"Sec. 19. That the governor, by and with the advice of the legislative council, shall appoint some person learned in law as attorney general for the Third judicial district of this territory, who shall reside and keep his office in the said Third district, and shall continue in office for the term of two years, and until his successor shall be appointed and qualified.

"Sec. 20. The district attorney for the Third district shall be required to perform the same duties, in the several counties of his district, as designated as the duties of the attorney general, and shall receive the same fees for his services, and no more.

"Sec. 21. The said district attorney shall receive a salary of four hundred dollars annually, to be paid out of the territorial treasury, in addition to his fees of office: provided, that in no case shall any fees be charged against the territory.

"Sec. 22. That all laws applicable to the attorney general shall be applicable to the said district attorney for the said Third district.

"Sec. 23. Be it further enacted, that if, from any cause, the attorney general shall fail to attend any term of the district court, in such case the presiding judge of said court is authorized to appoint some person of his confidence to represent the attorney general during the term of the district court, and the person so appointed by said judge shall receive five dollars per day for his services for all the time the said court may continue in session, and, further, shall be entitled to all the fees allowed by law to the attorney general, and the sum paid to the person thus appointed shall be deducted from the salary

allowed to the attorney general; and the auditor of public accounts, in such case, is required to draw on the territorial treasury for the pay of the person so appointed by said judge on his services being certified by a certificate of the said judge.

"Sec. 24. That this act shall take effect from and after its passage.

"Approved February 28, 1862."

### Third.

"An act designating the districts of the attorney general and district attorneys."

"Sec. 25. That hereafter it shall be the duty of the attorney general to attend and prosecute in the supreme court of the territory, and in the district courts of the counties of Santa Fe, San Miguel, Mora, Taos, and Rio Arriba, and he shall receive the salary and fees as at present prescribed by law.

"Sec. 26. There shall be a district attorney appointed by the governor, by and with the advice and consent of the legislative council, for the counties of Santa Ana, Bernalillo, Valencia, and Socorro; and another appointed in the same manner for the counties which may now or hereafter be created in this territory south of the Jornada del Muerto, who shall perform the duties and receive the fees and salaries now established by law.

"Sec. 27. That this act shall take effect from·and after its passage.

"Approved January 28, 1863."

### Fourth. ASSIGNMENT OF JUDGES.

"An act in relation to the judicial districts.

"Section 1. That from and after the passage of this act the territory of New Mexico shall be divided into three judicial districts, as follows, to-wit: The counties of Santa Fe, San Miguel, Mora, Taos, Rio Arriba, shall constitute the First judicial district; and the counties of Santa Ana, Bernalillo, Valencia, and Socorro, shall constitute the Second judicial district; and all that part of the territory embraced in the county of Dona Ana shall constitute the Third judicial district: provided, that the times and places of holding the courts remain in force as now provided by law.

"Sec. 2. That the Honorable KIRBY BENEDICT, chief justice, be, and is hereby, assigned, as now provided by law, to the First judicial district; that the Honorable SIDNEY A. HUBBELL, associate justice, be, and he is hereby, assigned to the Second judicial district; and the Honorable JOSEPH G. KNAPP, associate justice, be, and is hereby, assigned to the Third judicial district."

The act first herein set out is, as shown by the title, "An act to create the office of attorney general." It also determines the tenure thereof, and the salary connected with the same. This was in February, A. D. 1859. Three years later, Feburary 28, 1862, the second act set out above was approved. Its construction is the one about which there is most contention. It is the only act found in which the term of office for district attorney for the Third district is claimed to be fixed, and this contention cannot prevail unless the words "attorney general," used in the nineteenth section of the act, were intended to be "district attorney." In the act of 1859 the duties of the attorney general were co-extensive with the territory, but by the act of 1862 his duties were expressly limited "to the supreme court, and the district courts of the First and Second districts," and his salary was reduced to $600. In the act of January 28, 1863, section 25, as above set out, the territorial limits within which the attorney general was to exercise his duties were again reduced and restricted to what now constitutes the First judicial district. These acts also establish a legislative intent, not only to restrict the limits within which the attorney general should discharge the duties of a prosecuting officer in the

actual trial of causes, but also in intent to create prosecuting officers within the several districts. By section 19 of the act of 1862 a prosecuting officer was provided for in the territory in which, by the former act, the attorney general had been prosecutor, while assigning the attorney general to like duties in the other district. In the act of January, 1863, the attorney general is assigned to duty as a prosecutor; a district attorney is provided for Santa Ana, Bernalillo, Valencia, and Socorro; and a district attorney for the county south of the Jornada del Muerto was provided. While this last region is not named as the Third district, it was so in fact. In this act no tenure is fixed. It provides an additional district attorney. The intent to provide a separate prosecuting officer within each district by some designation is thus clearly apparent. Was it the purpose, by the act of 1862, to provide for two attorney generals, one for the First and Second districts, and one for the third district? or was the purpose of the act to provide a district attorney for the Third district, and assign the attorney general to the other two?

It is a well-settled rule of construction that resort may be had, not only to the words of a statute, but as well to its title and context. "If a doubt arise as to the proper construction to be given to a particular clause of a statute, resort must be had to the entire section or statute upon the subject of which the clause in question forms a point." Sedg. 237; *Williams* v. *Thomas*, 9 Pac. Rep. 356; same case, 3 N. M. 324, (decided last term.)

The title of this law and the context are radiant with light to aid construction. It is designated by the legislature, "An act  *  *  *  to authorize the governor to appoint *a district attorney* for the Third district." It is not an act to provide for an additional attorney general for such district, but, by name, for a district attorney. In the very beginning it purports to legislate respecting two officers by different names, performing duties of the same general character, but within different territorial limits. It is true the words "attorney general" are used in the nineteenth section. Is such use a clerical inaccuracy? There can be no doubt it was intended by the act to provide a prosecuting officer for the Third district. If the purpose was to designate him attorney general, it is difficult to understand why, in sections 20 and 21, immediately following section 19, such officer should be designated as a *district attorney*. In section 20 the prosecuting officer is designated "the district attorney for the Third district." In section 21, "the said district attorney." In section 22, "the said district attorney."

The word "said," in these two sections, in ascertaining the legislative intent, is full of significance. To what do they refer? What is meant when it is stated in section 20, "The *district attorney* for the Third district shall be required to perform" certain duties therein named? The term "said district attorney" either refers back to the officer mentioned in the nineteenth section as attorney general, or it is absolutely meaningless. If such term does not refer back to that section, to what is reference made? No satisfactory answer can be made to this inquiry.

Unless section 19 provides for a "district attorney," then, at the time of the passage of the act, there was no such officer, and the reference in the sections 20, 21, and 22 are to officers having no existence, for whom no provision had been made. Such an interpretation would declare the assembly and the legislature of 1862 guilty of the absurdity of providing duties, fixing a term and salary for an office not in existence, nor called by that body into being. If, however, it is held that the words "attorney general" were inserted in the act by clerical mistake, when the words "district attorney" were intended, and the section read in that way, then the whole act is consistent with its title, each section with every other, and the act becomes at once intelligible and effective.

The preamble and the said several sections are here placed in juxtaposition, that their true interpretation and meaning may be the more apparent:

"An act to amend the law relative to the attorney general, and to authorize the governor to appoint a district attorney for the Third district of this territory."

"Sec. 19. That the governor, by and with the advice of the legislative council, shall appoint some person learned in law as attorney general for the Third judicial district of this territory, who shall reside and keep his office in the said district, and shall continue in office for the term of two years, and until his successor shall be appointed and qualified.

"Sec. 20. The district attorney for the Third district shall be required to perform the same duties, in the several counties of his district, as designated as the duties of the attorney general, and shall receive the same fees for his services, and no more.

"Sec. 21. The said district attorney shall receive a salary of four hundred dollars annually, to be paid out of the territorial treasury, in addition to his fees of office: provided, that in no case shall any fees be charged against the territory.

"Sec. 22. That all laws applicable to the attorney general shall be applicable to the said district attorney for the said Third district."

Read literally, the whole act, so far as it undertakes to provide a prosecuting officer for the Third district, is wholly nugatory, as no duties are prescribed for an attorney general for the Third district, nor fees, nor salary. Read according to its spirit and evident intent, it is a harmonious and effective act, creating, as the title says it intends to do, a district attorney, fixing his fees and salary, prescribing duties and tenure. That section 19 should be read according to its evident intent, and not literally, is very clear. Where two constructions may reasonably be adopted, one of which will render an act wholly nugatory, and the other will make it effectual, the latter should be adopted.

The act of 1863 amounts to a legislative construction of the former act. It provides for the appointment of a district attorney in the territory south of the Jornada del Muerta, who shall receive the fees and salary now established by law. Unless the act of 1862 prescribed duties and provided fees for such an officer, none existed. The act of 1862 assumes that such an office was in existence, as the title clearly implies. It is plain that section 19 of the said act of 1862 should be construed to create and fix the tenure of office of the district attorney for the Third district, and that under said act the governor, by the advice and with the consent of the legislative council, appoints such officer, who holds his place for two years, and until his successor is appointed and qualified. He holds, then, by a fixed tenure. This is the law applicable to the office in controversy.

It is not contended that Mr. Wade's time had expired when Mr. Ashenfelter received his commission. So the conclusions reached compel a consideration of the last inquiry, as to the power of the executive, at his own will, to remove this officer holding a term fixed by law; and that question will now be considered.

Under our governmental system all power is inherent in the people, and the executive has the express and incidental powers conferred by law, and no more. For the right asserted by appellant he must affirmatively show legal authority. Even in England, where parliament is supreme, and where acts of parliament can seldom be questioned, the power of the crown is always open to question, and no one can give or be deprived of rights by prerogative interference, except in strict accordance with the law of the land. No executive authority exists outside of its legal boundaries. 12 Coke, 76; 1 Inst. 36, 63, 496.

Various statutes of this territory are cited by appellant to establish that the executive was clothed with the power of removal at the date when Ashenfelter received his commission. These will now be considered.

It is claimed by the appellant that section 1740, Comp. Laws, gave to the executive power to make an appointment to the office of district attorney during the recess of the legislative assembly. That section is in the following terms: "In all cases wherein the governor is or may be authorized by law to make appointments by and with the advice and consent of the council, he is hereby authorized to make temporary appointments during the recess of the assembly, to continue until the meeting of the same."

It is contended that as the governor is empowered, during a session of the legislative assembly, to appoint a district attorney by and with the advice and consent of the council, that in the recess, by virtue of the foregoing section, he may alone appoint, until the meeting of the council. Such a contention assumes that, if the legislative assembly had been in session at the date of Ashenfelter's commission, the governor would in that event have been clothed with power, acting with the council, to appoint him. While the executive might so appoint during a session of the assembly to fill a vacancy, it does not necessarily follow that he could do so where no vacancy existed. The whole question resolves itself into the power of the governor to remove. If he did not have the power to remove, no vacancy occurred, as Wade held by a fixed tenure, which had not expired at the date of the attempted removal. The foregoing section means only that, *where a vacancy* occurs during the recess, the governor may appoint in the interim, and not that during such recess he may fill an office already full with an existing incumbent. Unless the executive had the power to create a vacancy by removal, there was no vacancy to fill during the recess, so the section cannot aid the appellant until it be first determined that there was, at the time of his appointment, a vacancy, and that depends on the extent of the executive power.

Section 1841, Rev. St. U. S., is also referred to as giving authority to the executive to make this appointment. So much of this section as is pertinent to this discussion reads as follows: "The executive power of each territory shall be vested in a governor, who * * * shall take care that the laws be faithfully executed."

A similar provision was under consideration in *Field* v. *People*, 2 Scam. 91. As the case will be referred to upon another point, it is worthy of observation that the supreme court, at the time that case was decided, contained among its members such able judges as BREESE, SCATES, and TREAT, of national fame for learning and ability. It is there said of a like provision: "This clause is merely declaratory and directory. It confers no specific powers, nor does it enjoin any specific duty. This power of general supervision, says an able commentator on American law, (2 Walk. Amer. Law, 103,) is a duty enjoined on the federal and state executives. It would be dangerous, however, to treat this clause as conferring any specific power which they would not otherwise possess. It is to be regarded as a comprehensive description of the duty of the executive to watch with all vigilance over the public interests. The governor is not to execute the laws himself, but see them executed. This duty is performed by lending the aid and power of the executive arm to overcome resistance to law. The history of the federal and state governments afford practical exposition of this clause of the constitution, in conformity with this construction. The executive is to see the laws executed as they may be expounded by those to whom that duty is intrusted. If this clause confers the power of supervision and dismissal as to one officer, it also gives the same authority over every other one in the government * * * upon whom the performance of a duty may be enjoined. The injunction to see the laws executed is general, and sufficiently comprehensive to embrace every law and officer. If, under this clause, the governor may dismiss the secretary, it cannot be seen why he may not dismiss every other one, without regard to their manner of appointment or the tenure of office, and thus, by the construction of one clause, bring all the officers, and the operation of all the

laws of the state, under executive control.  This would counteráct the whole scope and design of the constitution, by substituting the changing and capricious will of one man for the fixed and known rules of the law.  From this consequence there is no escape if the rule be as contended for."

This quotation from a learned court constitutes such an able statement of reasons why the construction contended for by appellant as to the power contained in section 1841 should not prevail that it leaves but little more to be said. The section is in its very terms declaratory, and it must be apparent that it was not intended by this act to give to the executive the power to remove at will.    The several departments of government, the executive, legislative, and judicial, under our system, are separate and distinct in the performance of different functions closely related to each other, yet independent.    To construe this section so as, by reason of its terms alone, to give power to the executive to remove at will, would enable such department, by exercise of the mere power of removal, to override and control the judicial.   If the personal or official action of a prosecuting officer should be displeasing, the executive could arbitrarily remove at will, and thereby, by virtue of the power of removal, could control the whole judicial machinery, so far as it relates to the criminal law; and the executive, as an incident to this power, would be able to control the course of proceedings in a co-ordinate and distinct department of the government, and to make the judicial prosecuting officers wholly subservient to executive direction.   Such a result under a system where independent action in the several departments of government is everywhere recognized, was surely not intended in the section invoked by appellant.   It is not believed any such power is conferred by that section.

A very able argument is made by appellant's counsel, drawn from the power of removal exercised by the president, and therefrom it is sought to be deduced by analogy that a similar authority exists in state and territorial executives. To extend the argument thus made to its legitimate end, if it is one proper to be adopted, the right of removal would thereby be carried to every executive of the several states, except when express limitation prevailed, in as full and ample a manner as that authority heretofore existed in the chief executive of the United States.   If such a view were correct, the exercise of that right by state executives would have been so frequent, that the record of adjudication, now very numerous, would be a mine of information and authority establishing such a continuous exercise of the power by judicial sanction that the right of state executives would be as clearly ascertainable as that conceded in the president.   No precedent has been referred to, in the presentation of this case, where the power of removal by a state executive, against one holding office by a certain tenure, has been sanctioned by the courts of last resort.   This is, of itself, strong and persuasive against the right, and greatly weakens the argument upon the analogy sought to be maintained between the powers of the general and territorial governments.

The reasoning of the court in *Field* v. *People, supra,* is here quoted as a sufficient answer to the contention on that point:

"The marked disparity between the powers and responsibility of the general government and that of this state naturally and necessarily results from the different character of the respective governments, their powers, duties, and the object of their creation.   The government of the United States is the national government of the Union.   To that is delegated the attributes of national sovereignty.  The duties of the executive of the national government are therefore widely extended and greatly diversified; embracing all the ordinary and extraordinary arrangements of peace and war, of diplomacy and navigation, of finance, of naval and military operations, and of the execution of the laws throughout almost infinite ramifications of details, and in places at vast distances from each other.   His views are not bounded even by the circuit of the whole Union, but must extend to the most remote regions to

which commerce or navigation has extended or connected our interest. So multifarious and diversified, therefore, are the functions of his office, that the limited abilities of no one man are equal to their discharge. Hence the necessity of organizing various departments, and the employment of numerous ambassadors and other public ministers, all of whom constitute so many aids and helps in the performance of the executive duties of the president. And as many of the duties of these officers cannot be regulated by law, because they cannot be anticipated, but arise out of the changing exigencies of time and circumstances, large discretion must, from necessity, be vested somewhere; and it has been vested in the president as the chief executive officer of the government. From his interest in and control over all the business of the executive department, and his political responsibility for its administration, arises his right to supervise, control, and dismiss those executive officers who are his political and confidential aids in the discharge of his executive duties.

"But the state governments are widely different in their objects, powers, and duties. Compared with the general government, they may be denominated domestic governments. They act exclusively upon the domestic relations of life. Their regulations and sphere of action are limited to their territorial boundaries. The powers and duties of the chief executive magistrate, therefore, are proportionably limited, and such as from their nature are capable of being specifically prescribed and regulated by law; and, unlike those of the president, they may all be performed in person. He neither has, nor does he require, the aid of others in the performance of any of his duties. The duties, likewise, of all the executive officers of the state, are capable of being regulated by law; and by our constitution they are required to be so regulated. No discretionary authority or control over them is delegated to the governor by the constitution, nor does it contemplate the delegation of such power by law. From the discretionary powers with which the president is clothed, there is a necessity for his possessing the power of removal, which does not exist in the case of the governor. The heads of the departments and public ministers being the political and confidential officers of the president to execute his will, and act in cases in which he possesses a legal discretion, all their acts in this character are only politically examinable. The duties which are not enjoined by law cannot be enforced by its process. But, as the law has expressly given to the president the right to prescribe the duties of those officers, it also gives, by necessary implication, the power of removal, as a means of rendering available the authority expressly granted."

We are thus brought to the last point of the appellant's contention, to-wit: "That the power to remove is a necessary legal adjunct and incident of the power of appointment." Fortunately, authority entitled to much consideration exists, making the question reasonably clear.

The subject is discussed in two classes of cases. In one class where the office is held without any fixed term; in the other, where the law has attached to it a time during which the occupant may hold. In the first class, where the office is held only at the will of the appointing power, the right to remove does exist as an incident of the power to appoint. *Ex parte Hennen,* 13 Pet. 256; *Keenan* v. *Perry,* 24 Tex. 253. In the other class of cases, however, the ruling is different. In the case of *People* v. *Bissell,* 49 Cal. 412, it is said: "The word 'tenure,' as used in this section, is, in my opinion, to be construed as meaning 'term;' the effect of which is to continue the incumbent in office for the period of four years from the time of his appointment. Under that construction, *his term not having expired, the governor had no power to appoint.*"

The case for determination by this court comes within the second class, those where the tenure is fixed by law, as it is hereinbefore held, upon a construction of the territorial statutes, that Wade held his office for a fixed period, which had not expired when the relator received his commission.

In Texas there is this provision: "The governor shall appoint one county treasurer, who shall hold his office until the next general election in this state, or until otherwise provided by law." The supreme court of that state made its ruling under such a statute from which we quote: "The county treasurer, when once appointed in the mode prescribed by law, has a vested right to his office, and cannot be removed except for cause amounting to a forfeiture of his office. He can only be removed on conviction, by a jury after an indictment, for malfeasance, misfeasance, or nonfeasance in office. The principle that the *power of removal is incident to the power of appointment* is applicable only in those cases where the office is held at the pleasure of the appointing power, and the *tenure is not fixed by law.*" *Collins* v. *Tracy,* 36 Tex. 547.

In *People* v. *Jewett,* 6 Cal. 292, Chief Justice TERRY states the point decided this way: "The case under consideration presents the single question whether the governor of this state can remove from office a notary appointed under the provisions of this act, *before his full term has expired.*" It was held by the court, the office being for a fixed term, the governor could not, during the continuance of the term, remove the incumbent.

"All offices must be created in accordance with law. Unless they are held during the pleasure of the executive, or subject to removal at his will, an office is as much a species of property as anything which is capable of being held or owned." *Wammack* v. *Holloway,* 2 Ala. 33.

In the Texas case, *supra,* it is said: "The holder of an office has a vested right therein;" in the Alabama case, that the right to hold such office, where the term is fixed, is a species of property, so an arbitrary removal without notice, or opportunity to be heard or deny charges, would be taking away property without process of law.

The supreme court of Michigan, in *Dullam* v. *Willson,* 53 Mich. 392, 51 Amer. Rep. 128, and 19 N. W. Rep. 112, delivered an elaborate and exhaustive opinion, reviewing the authorities on this subject, with Judge COOLEY as a member of the bench. In that case, Wilson, the respondent, was in possession of the office of trustee of the Michigan Institution for the Advancement of the Deaf, Dumb, and Blind. His term expired by law, February, A. D. 1887. He held his appointment from the executive. On the second of July, 1883, Gov. Begole, without preferring charges against Wilson, or giving him opportunity to answer, deny, or explain charges of official misconduct, attempted to remove him by an executive order which read as follows:

"EXECUTIVE OFFICE, LANSING, July 2, 1883.

"*To James C. Wilson, Esq.*—DEAR SIR: I have this day, for your official misconduct and habitual neglect of duty, removed you from the office of trustee of the Michigan Institution for the Deaf and Dumb. The reasons for such removal I shall lay before the legislature at its next session.

"Yours respectfully,                          JOSIAH W. BEGOLE."

On the same day the governor appointed, in due form of law, the relator, Dullam, to the place, and Wilson, refusing to retire, was brought into court by proceeding in *quo warranto.* The governor of Michigan was supported by an authority which does not exist in this territory, making that case a much stronger one in favor of the power of removal than the present one. A constitutional provision there in force read as follows: "The governor shall have power, and it shall be his duty, except at such time as the legislature may be in session, to * * * remove from office for gross neglect of duty, or for corrupt conduct in office, or any other misfeasance or malfeasance, either of the following state officers," (among them the trustee named in the governor's order.) Under such circumstances, upon a very careful consideration, the learned court held that the governor must first notify the officer of the intention to remove, with statement of the causes, and give him an op-

portunity to be heard; and also denied the executive right to make the change by the mere act of removing the incumbent and appointing his successor.

In the opinion delivered by Judge CHAMPLIN, in the case, he makes the following very clear and forcible observations: "I do not think the people, when they adopted this amendment, intended or supposed that they were placing such unlimited power in the hands of any man. If it exists, it places in the power of the governor, at his mere will or caprice, to remove all the state officers, except legislative and judicial, and to fill their places with his own partisans, thus revolutionizing the whole administration of the state, and defeating the express will of the people. It is no argument to say that it may never be done. It is sufficient to know that it could be done."

These reasons apply with greater weight when the officer sought to be removed is one in no way connected with the executive duties, but is in a separate department, performing duties as an officer of the court.

In the state of Kentucky the statute required the secretary to reside and perform his duties at the seat of government. Benjamin Hardin, secretary, declined to do so, and the governor attempted to remove him, and made an executive order to that end in these words:

"SEPTEMBER 1, 1846.

"Whereas, Benjamin Hardin, by his failure, willful neglect, and refusal to reside at the seat of government, and perform the duties of secretary, has abandoned said office, and said office, in the judgment of the governor, has become vacant for the cause aforesaid, it is therefore declared by the governor, and ordered to be entered upon the executive journal, that the office of secretary has become and is vacant; wherefore, to fill the vacancy, the governor this day commissioned George B. Kinkead, Esq., to be secretary till the end of the next general assembly of Kentucky."

The governor of Kentucky had the express power by statute to remove, but it was held the removal could not be made without the incumbent was first given the opportunity to be heard. Chief Justice TOM MARSHALL delivered the opinion of the supreme court, and said: "The secretary being removable for breach of good behavior only, the ascertainment of the breach *must precede the removal;* in other words, the officer must be convicted of misbehavior in office. And we shall not argue to prove that, in a government of laws, a conviction whereby an individual may be deprived of valuable rights and interests, and *may, moreover, be seriously affected in his good fame and standing,* implies a charge and trial and judgment with opportunity for defense and proof." *Page* v. *Hardin,* 8 B. Mon. 672. The court further held in that case, as no other power existed to hear complaints, the secretary must first be charged in a judicial tribunal, and denied the power of the governor to arbitrarily remove before such hearing.

A very able discussion of executive power is to be found in *State* v. *Pritchard,* 36 N. J. Law, 114. In that case it was the duty of the governor to fill vacancies. Certain police commissioners were convicted of a crime to cheat and defraud, and sentenced to pay a fine of $100 each. The attorney general officially advised the governor that thereby their offices became vacant, and recommended the appointment of successors, which was done. The incumbents denied that the offices were vacant, and resisted the right of the governor's appointees, and upon a proceeding in *quo warranto* the case came before the supreme court. The power of the governor was denied, and it was held there must first be judicial determination of the fact of vacancy before the governor could appoint.

The case is one worthy of careful study, and quotation is made at some length: "It is obvious, therefore, that the governor of this state is not possessed of a particle of judicial capacity. I cannot see that a single one of the powers conferred upon this high office even borders upon such authority. It is true that he is empowered to fill certain vacancies, and in doing such acts

he must decide whether or not such vacancies exist. But such decision is in no sense a judicial act. It is a mere assumption of the existence of a certain state of facts on which to base executive action. Such assumptions or determinations by the chief executive, when they relate to or affect private interests, have no binding force. If the executive should fill an office on the conviction that the incumbent was dead, it is presumed that in the mind of lawyers there would prevail no doubt that, if the fact of death had not occurred, the executive action would be void. An estoppel of private right by executive decision is not likely to be pleaded by any well-skilled counsel. I think there is no reasonable ground on which to base a claim for the existence of any right of judicature in the governor of the state. And there can be as little doubt that the act of declaring that the offices involved in this case had been forfeited was a judicial decision. It had all the essential elements of such an adjudication. It was a determination of the fact as well as the law, and comprised at once the functions of the jury and the judge, and it related to a right of property. The questions to be settled were whether the officer had misbehaved,— and that was an issue of fact,—and whether such misbehavior amounted to a forfeiture of office,—and that was an issue of law. The point of fact required the introduction of evidence, and for this purpose the governor had before him the record of the conviction of these defendants in a criminal court. Whether such record would be competent for the purposes for which it was used, is open, as a question of pure law, to considerable uncertainty; the usual and inveterate rule being that a criminal record is not admissible in any suit or proceeding relating to property or the civil rights of persons. But it is enough to denote that here was presented a rule of evidence to be passed upon. In all its parts the proceeding was one of ordinary judicature. And then, too, after the ascertainment of the fact, it became necessary to apply the rule of law. The result was an announcement that the forfeiture had been incurred. And this, clearly, was an act of judicial discretion. Than the judgment of the judge, there is no other legal test of the effect a certain act of misconduct has upon the right to office. What malfeasance will work a forfeiture is no part of the *lex scripta*. There is no statute upon the subject. It is obvious that it may well be that some convictions in a criminal court may not produce such a result. The point is not met by the suggestion that in this case the crime committed was one *malum in se*, and made highly penal, because, if the jurisdiction is vested in the executive on this occasion, it belongs to him in all cases of official misdemeanor. It is not too much to say that of all the cases where there is room for the use of a graduated standard for judicial judgment the class of cases which comprises the one now considered is the most prominent. What jurist or judge has ever attempted to define that category of offenses which in law are operative to deprive the wrong-doer of a public office? And yet such was the question upon which the executive was called upon to pronounce. These acts were judicial in the most rigorous sense of the term."

It will be observed, from the authorities cited, that in California and Texas there is a direct denial, in cases where the office is held by a fixed tenure, of the power of removal as an incident of the power of appointment; while an overwhelming weight of authority elsewhere is to the effect that, even when the power of removal for cause is expressly granted, such authority cannot be exercised without the incumbent has first had in some form an opportunity to be heard in his own self-defense.

This principle was recognized in *Ex parte Garland*, 4 Wall. 378, by the supreme court of the United States, where it is said, speaking of attorneys as officers of the court: "They hold their office during good behavior, and can only be deprived of it for misconduct, ascertained and declared by the judgment of the court after opportunity to be heard has been afforded;" citing *Ex parte Heyfron*, 7 How. (Miss.) 127; *Fletcher* v. *Daingerfield*, 20 Cal. 439.

The removal from office not only deprives the possessor of a valuable private right, and affects public interests, but it also implies wrong-doing and injures

the good name of the incumbent. It would seem a first principle of justice that one should not be tarnished without opportunity to be heard in his own behalf. If the executive may at will direct the official to stand aside, and enforce the demand, it operates as a trial without notice, and a judgment without evidence, with no power for rehearing or appeal. Such eminent jurists as TREAT, MARSHALL, COOLEY, and others equally learned, have denied the existence of such executive power. The courts of last resort, some directly and others in effect, in Texas, California, Michigan, Kentucky, Rhode Island, and New Jersey have also refused their sanction to executive acts predicated on such an assumption. The whole theory of the state government is in favor of a division of powers, and against concentration in the hands of a single person or department. Fixed terms, certain tenures, rights divested only after notice, evidence, and trial, tend to stability, and the regular and orderly exercise of the functions of government by the different departments; whereas, office held only at the will of a single person, exercising authority above inquiry, and whose conclusions are final and beyond the power of any other tribunal to review, tends to arbitrary action, and is not in harmony with the liberal spirit upon which our institutions are founded.

Judge CAMPBELL, in *Dullam* v. *Willson, supra,* said: "It is not satisfactorily shown that any different doctrine has ever prevailed in the United States, except in some isolated cases; and it would require a unanimity of decision amounting to an entire removal of old land-marks to justify the recasting of constitutional principles which underlie our whole system," and authorize us to give judicial sanction to the creation of a vacancy by executive fiat in an office with a fixed tenure, and thereby declare the forfeiture of a vested right without day in court, trial, judgment, or opportunity for appeal or review.

In the language of the learned supreme court of the state of Michigan in the case last cited, it is proper to add that, "in what has been said upon the law of this case, there has been no wish or purpose to cast the least imputation on the motives of the executive. The same presumption of good faith and honest desire to act within legal and constitutional limits are accorded to him as to either of the co-ordinate branches of the government, and his motives are not the subject of criticism. No doubt, he acted upon the impression that he was entirely within the line of his duty, as well as of law, and that he believed the removal of the respondent was demanded by the best interests of the public service."

It is a very delicate task for one department of the government to pass upon the acts of either of the others. It is, however, unavoidable, as the law has imposed upon the judiciary duties it cannot and should not seek to escape, but rather to discharge them with the highest respect for the other departments, with the single purpose to maintain only those principles of law firmly established by the weight of authority, well founded in justice, proper for the protection of human rights, and the maintenance of that system which prevails, that every one, however humble, shall be heard before he is condemned or his right denied.

It is held that this proceeding was properly commenced in the court below by information in the nature of a writ of *quo warranto;* that the process properly issued, on motion, by order of the court; that it was rightfully made returnable at a day during the same term; that the court had jurisdiction to hear and determine the cause; and that Edward C. Wade was, at the commencement of the proceeding, and that Singleton M. Ashenfelter was not, the lawful and rightful district attorney for the Third judicial district, and that there is no error in the record. The judgment of the court below is affirmed, and costs taxed against the appellant.

BRINKER, J., concurs.

NOTE.

QUO WARRANTO—AGAINST OFFICERS. The power to issue writs of *quo warranto* given to the supreme court by the constitution of *Florida* includes informations in the nature of *quo warranto.* State v. Anderson, 8 South. Rep. 1. A proceeding in the nature of *quo warranto* against a person in office is the appropriate manner of testing the validity of the statute by which the office was created. People v. Riordan, (Mich.) 41 N. W. Rep. 482. *Quo warranto* information is the proper remedy to try the title to an office; but an incumbent cannot use it against one who has not been in the actual possession and user of the franchise. State v. Chosen Freeholders, (N. J.) 1 Atl. Rep. 515. The fact that a contest proceeding under the statute to determine the right to an office as between rival candidates is pending, does not prevent the state from proceeding by *quo warranto* to question the right of the person attempting to hold it. Vogel v. State, (Ind.) 8 N. E. Rep. 164. The fact that a method has been provided by statute for contesting an election does not deprive a claimant of his right to a remedy by information in the nature of *quo warranto.* The statutory remedy is merely cumulative, and jurisdiction does not fail because there is an adequate remedy at law. State v. Frazier, (Neb.) 44 N. W. Rep. 471. The provision of the constitution of *Colorado* that the legislature shall, by general law, designate the courts and judges by whom election contests shall be tried, does not take away the remedy by *quo warranto* authorized by article 6, § 3, of the constitution, but provides a concurrent remedy, which is usually instituted by an unsuccessful candidate for an office, to determine his right thereto, while *quo warranto* is in the name of the people, to determine the right of the incumbent to the office. People v. Londoner, 22 Pac. Rep. 764. But in *Kansas* it is held that *quo warranto* will not lie where other adequate remedies exist. State v. Wilson, 2 Pac. Rep. 828.

The right of a private person to institute proceedings in *quo warranto* depends on his own superior claim to the office, and his eligibility must be shown. Vrooman v. Michie, (Mich.) 36 N. W. Rep. 749. But, under Code Civil Proc. Cal. § 803, authorizing the attorney general to bring the action in the name of the people on his own information or on the complaint of a private party, it is not necessary for the complaint to show that the relator is entitled to the office, or that any one else claims to be entitled to it. People v. Bingham, (Cal.) 22 Pac. Rep. 1039. Where the governor of a state has the power to remove an officer, his act in so doing cannot be questioned in proceeding in *quo warranto,* since he does not act in a judicial capacity. State v. Hawkins, (Ohio,) 5 N. E. Rep. 228. And where a statute provides that the city council shall be the judge of the election, returns, and qualifications of its own members, *quo warranto* will not lie to determine the right of a member to hold his office. State v. Berry, (Ohio,) 24 N. E. Rep. 266. *Quo warranto* lies only to remove the illegal incumbent of an office, and not to induct the legal claimant; and therefore the court will pass upon the question of the respondent's election, but not upon that of the relator's election. State v. Lane, (R. I.) 18 Atl. Rep. 1035. An information in the nature of *quo warranto* will not lie to determine who has the power of appointment to an office when it appears that the respondent will remain in the office whatever the decision may be. State v. McCullough, (Nev.) 18 Pac. Rep. 756.